BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE HOLLIN, Derivatively on Behalf of Nominal Defendant SUPER MICRO COMPUTER, INC., | Case No. _____ |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| CHARLES LIANG, SARA LIU, DANIEL W. FAIRFAX, TALLY LIU, SHERMAN TUAN, JUDY LIN, ROBERT BLAIR, YIH-SHYAN LIAW, SUSIE GIORDANO, SHIU LEUNG CHAN, MICHAEL S. MCANDREWS, HWEI-MING TSAI, SARIA TSENG and DAVID WEIGAND, | |
| Defendants, | |
| and | |
| SUPER MICRO COMPUTER, INC., | |
| Nominal Defendant. | |

Plaintiff Lawrence Hollin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Super Micro Computer, Inc. ("SMCI" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding SMCI, legal filings, news reports, securities analysts' reports about the Company, the securities class actions *Menditto v. Super Micro Computer, Inc. et al.,* Case No. 3:24-cv-06149-SI (N.D. Cal.); *Spatz v. Super Micro Computer, Inc. et al.,* Case No. 5:24-cv-06193-PCP (N.D. Cal.); and *Averza v. Super Micro Computer, Inc. et al.,* Case No. 5:24-cv-06147-EJD (the "Securities Class Actions"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of SMCI against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least February 2, 2021 and August 26, 2024, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2.     SMCI is multinational technology company based in San Jose, California that designs, manufactures, and sells server and storage solutions for various markets, including enterprise data centers, cloud computing, artificial intelligence, 5G and edge computing.

3.     Throughout the Relevant Period, certain of the Company's officers and directors issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the

Company lacked adequate accounting procedures and controls and had engaged in numerous accounting improprieties including issues related to revenue recognition; (ii) the Company had engaged in undisclosed related-party transactions; (iii) the Company had been exporting large volumes of product to Russia in contravention of United States trade restrictions due to the Russian invasion of Ukraine; (iv) as a result, the Company was at heightened risk of regulatory scrutiny; and (v) as a result of the foregoing, the Company's financial results were misstated, and positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

4.      On August 27, 2024, Hindenburg Research ("Hindenburg") issued a report which revealed "glaring accounting red flags, evidence of undisclosed related party transactions, sanctions and export control failures, and customer issues."

5.      Specifically, it was revealed that the Company had been improperly recognizing revenue, publicly mispresenting some its related party dealings and completely failing to disclose others, and circumventing United States trade restrictions by shipping products "to Russia in larger-than-ever volumes since the invasion of Ukraine."

6.      On this news, the price of SMCI's stock declined 21.16% in two days, from a price of $562.51 per share on August 26, 2024 to a price of $443.49 per share on August 28, 2024.

7.      As a result of the foregoing, the Securities Class Actions were filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

8.      Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Actions, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand

on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

10.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because SMCI is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

14.    Plaintiff is, and has been at all relevant times, a shareholder of SMCI.

*Nominal Defendant*

15.    Nominal Defendant SMCI is incorporated under the laws of Delaware with its principal executive offices located at 980 Rock Avenue, San Jose, California 95131. SMCI's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "SMCI."

*Individual Defendants*

16.    Defendant Charles Liang ("Liang") co-founded the Company with Defendants

Sara Liu and Liaw, and Liang has served as SMCI's President, CEO, and as Chairman of the Board since the Company's inception in September 1993. According to the Company's public filings, Defendant Liang received $18,098,671 during fiscal year 2021 in compensation from the Company. Defendant Liang is married to Defendant Sara Liu. As of November 24, 2023, Defendants Liang and Sara Liu jointly own 7,815,881 shares of SMCI common stock, worth $2,232,762,725[1] and constituting 14.3% of the Company's total outstanding common stock. Defendant Liang is named as a defendant in the Securities Class Actions.

17.    Defendant Sara Liu co-founded the Company with Defendants Liang and Liaw and has served as a member of the Board since the Company's inception in September 1993. Defendant Sara Liu further serves as Senior Vice President ("SVP"). Defendant Sara Liu is married to Defendant Liang. As of November 24, 2023, Defendants Sara Liu and Liang jointly own 7,815,881 shares of SMCI common stock, worth $2,232,762,725 and constituting 14.3% of the Company's total outstanding common stock.

18.    Defendant Daniel W. Fairfax ("Fairfax") has served as a member of the Board since July 2019 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Fairfax received $317,800 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Fairfax beneficially owns 20,987 shares of SMCI common stock, worth $5,995,356.

19.    Defendant Tally Liu has served as a member of the Board since January 2019 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Tally Liu received $335,979 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Tally Liu beneficially owns 28,313 shares of SMCI common stock, worth $8,088,174.

20.    Defendant Sherman Tuan ("Tuan") has served as a member of the Board since

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $285.67 per share closing price of SMCI's stock on November 24, 2023.

February 2007. According to the Company's public filings, Defendant Tuan received $311,479 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Tuan beneficially owns 30,113 shares of SMCI common stock, worth $8,602,380.

21. Defendant Judy Lin ("Lin") has served as a member of the Board since April 2022 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Lin received $287,479 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Lin beneficially owns 4,863 shares of SMCI common stock, worth $1,389,213.

22. Defendant Robert Blair ("Blair") has served as a member of the Board since December 2022 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Blair received $149,015 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Blair beneficially owns 1,386 shares of SMCI common stock, worth $395,938.

23. Defendant Yih-Shyan (Wally) Liaw ("Liaw") co-founded the Company with Defendants Sara Liu and Liang, and has served as SVP and as a member of the Board since December 2023. Previously, Defendant Liaw served as a member of the Board from September 1993 until January 2018, during which time he held various executive positions at the Company, including SVP of Worldwide Sales and Corporate Secretary. As of November 24, 2023, Defendant Liaw beneficially owns 1,592,998 shares of SMCI common stock, worth $455,071,738 and constituting 3% of the Company's total outstanding common stock.

***Former Director Defendants***

24. Defendant Shiu Leung (Fred) Chan ("Chan") served as a member of the Board between October 2020 and March 2024.

25. Defendant Michael S. McAndrews ("McAndrews") served as a member of the Board between February 2015 and May 2021.

26. Defendant Hwei-Ming (Fred) Tsai ("Tsai") served as a member of the Board between August 2006 and May 2021.

27.     Defendant Saria Tseng ("Tseng") served as a member of the Board between November 2016 and May 2022.

***Officer Defendant***

28.     Defendant David Weigand ("Weigand") has served as SVP and Chief Financial Officer ("CFO") since February 2021. According to the Company's public filings, Defendant Weigand received $633,537 during fiscal year 2021, $2,204,033 during fiscal year 2022, and $1,859,089 during fiscal year 2023 in compensation from the Company. As of November 24, 2023, Defendant Weigand beneficially owns 53,130 shares of SMCI common stock, worth $15,177,647. Defendant Weigand is named as a defendant in the Securities Class Actions.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of SMCI, and because of their ability to control the business and corporate affairs of SMCI, the Individual Defendants owed SMCI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SMCI in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of SMCI and its shareholders so as to benefit all shareholders equally.

30.     Each director and officer of the Company owes to SMCI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SMCI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of SMCI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of SMCI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that SMCI implemented and properly monitored the Company's internal controls over financial reporting, including those relating to SMCI's revenue recognition practices; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.    To discharge their duties, the officers and directors of SMCI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of SMCI were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to SMCI's own Code of Business Conduct and

Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how SMCI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of SMCI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that SMCI's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36.     Each of the Individual Defendants further owed to SMCI and the shareholders the duty of loyalty requiring that each favor SMCI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37.     At all times relevant hereto, the Individual Defendants were the agents of each other and of SMCI and were at all times acting within the course and scope of such agency.

38.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SMCI.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

42.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of SMCI, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

44.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of SMCI and at all times acted within the course and scope of such agency.

## SMCI'S CODE OF CONDUCT

45.    SMCI's Code of Conduct states that its purpose is to encourage, *inter alia*:

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;
- Full, fair, accurate, timely and understandable disclosures;
- Compliance with applicable governmental laws, rules and regulations;
- Prompt internal reporting of any violations of law or the Code;

46.    The Code of Conduct applies to "all of [SMCI's] directors, officers and employees," and violations of the Code of Conduct "will result in disciplinary action, up to and including termination of employment."

47.    In a section titled "**COMPLIANCE WITH LAWS, RULES AND REGULATIONS**," the Code of Conduct states, in pertinent part:

The Company is obligated to comply with all applicable laws and regulations in all countries in which it operates.

The Company is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for the Company. Numerous federal, state and local laws and regulations define and establish obligations with which the Company, its employees and agents must comply. Under certain circumstances, local country law may establish requirements that differ from this Code. You are expected to comply with all local country laws in conducting the Company's business. If you violate these laws or regulations in

performing your duties for the Company, you not only risk individual indictment, prosecution and penalties, and civil actions and penalties, you also subject the Company to the same risks and penalties. If you violate these laws in performing your duties for the Company, you may be subject to immediate disciplinary action, including possible termination of your employment or affiliation with the Company.

48.     In a section titled "**FULL, FAIR, ACCURATE, TIMELY AND UNDERSANDABLE DISCLOSURE**," the Code of Conduct states, in pertinent part:

> All disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications made by the Company must be full, fair, accurate, timely and understandable. You must take all steps available to assist the Company in these responsibilities consistent with your role within the Company.

> To ensure that the Company meets this standard, you (to the extent you are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with your duties. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Company's preparation of its public reports and disclosure. You are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self- regulatory organizations.

49.     In a section titled "**FAIR DEALING**," the Code of Conduct states, in pertinent part that the "[o]ur goal is to conduct our business with integrity. You should deal honestly with the Company's customers, suppliers, competitors and employees. Under federal and state laws, the Company is prohibited from engaging in unfair methods of competition, and unfair or deceptive acts and practices."

50.     In a section titled "**PROTECTION AND PROPER USE OF COMPANY ASSETS**," the Code of Conduct states that the Company's employees, officers and directors "should endeavor to protect the Company's assets and ensure their proper use."

## SMCI'S AUDIT COMMITTEE CHARTER

51.     Pursuant to SMCI's Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*, "oversee the accounting and financial reporting processes of the Company, the integrity of the financial reports and other financial information and the audits of

the Company's financial statements" and "assist with Board oversight of the Company's compliance with legal and regulatory requirements."

52.     In a section titled "**REVIEW OF FINANCIAL REPORTING POLICIES AND PROCESSES**," the Audit Committee Charter states:

> To fulfill its responsibilities and duties, to the extent that it deems necessary or appropriate, and in addition to the items described above, the Committee shall:
>
> 1.  Review and discuss with the independent auditor any audit problems or difficulties and management's response.
>
> 2.  Review and discuss with management and the independent auditor the annual audited financial statements to be included in the Company's annual reports on Form 10-K, the quarterly financial statements to be included in the Company's quarterly reports on Form 10-Q, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
>
> 3.  Review and discuss with management press releases regarding the Company's financial results, as well as financial information and earnings guidance provided to securities analysts and rating agencies.
>
> 4.  Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

53.     In a section titled "**RISK MANAGEMENT, RELATED PARTY TRANSACTIONS, LEGAL COMPLIANCE AND ETHICS**," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

> 1.  Review any report on significant deficiencies in the design or operation of the Company's internal control structure and procedures for financial reporting ("Internal Controls") that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.
>
> 2.  Review, discuss and approve the internal audit function's (i) audit plan, (ii) all major changes to the audit plan, (iii) the scope, progress and results of executing the internal audit plan, and (iv) the annual performance of the internal audit function.

3. Periodically review and discuss with management and independent auditors the Company's disclosure controls and procedures and internal control over financial reporting as defined in applicable SEC rules.

4. Review, approve and oversee transactions between the Company and any "related party," as such term is defined in the rules of the Exchange and SEC rules, in accordance with the Company's related party transaction policies and procedures.

5. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

6. Review and investigate conduct alleged to be in violation of the Company's Code of Business Conduct and Ethics, and adopt as necessary or appropriate, remedial, disciplinary or other measures with respect to such conduct.

7. Periodically review and discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control the exposures, including the Company's risk assessment and risk management guidelines and policies.

8. Prepare the audit committee report required by the rules of the SEC to be included in the Company's annual proxy statement.

## SUBSTANTIVE ALLEGATIONS

54. SMCI is multinational technology company based in San Jose, California that designs, manufactures, and sells server and storage solutions for various markets, including enterprise data centers, cloud computing, artificial intelligence, 5G and edge computing.

55. Throughout the Relevant Period, certain of the Company's officers and directors issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company lacked adequate accounting procedures and controls and had engaged in numerous accounting improprieties including issues related to revenue recognition; (ii) the Company had

engaged in undisclosed related-party transactions; (iii) certain of the Company's disclosed related-party transactions were misrepresented and highly problematic (iii) the Company had been exporting large volumes of product to Russia in contravention of United States trade restrictions due to the Russian invasion of Ukraine; (iv) as a result, the Company was at heightened risk of regulatory scrutiny and intervention; and (v) as a result of the foregoing, the Company's financial results were misstated, and positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Individual Defendants' False and Misleading Statements***

56.     On February 2, 2021, SMCI issued a press release announcing the Company's financial results for its second fiscal quarter of 2021 (the "2Q2021 Release"), which reported the following results:

- Net sales of $830 million versus $762 million in the first quarter of fiscal year 2021 and $871 million in the same quarter of last year.
- Gross margin of 16.4% versus 17.0% in the first quarter of fiscal year 2021 and 15.9% in the same quarter of last year.
- Net income of $28 million versus $27 million in the first quarter of fiscal year 2021 and $24 million in the same quarter of last year.
- Diluted net income per common share of $0.52 versus $0.49 in the first quarter of fiscal year 2021 and $0.46 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $0.63 versus $0.55 in the first quarter of fiscal year 2021 and $0.57 in the same quarter of last year.
- Cash flow from operations of $63 million and capital expenditures of $14 million.

57.     The 2Q2021 Release further announced the resignation of the Company's CFO and the appointment of Defendant Weigand to the position.

58.     On May 4, 2021, SMCI issued a press release announcing the Company's financial results for its third fiscal quarter of 2021 (the "3Q2021 Release"), which reported the following results:

- Net sales of $896 million versus $830 million in the second quarter of fiscal year 2021 and $772 million in the same quarter of last year.
- Gross margin of 13.7% versus 16.4% in the second quarter of fiscal year 2021 and 17.3% in the same quarter of last year.
- Net income of $18 million versus $28 million in the second quarter of fiscal year 2021 and $16 million in the same quarter of last year.

- Diluted net income per common share of $0.35 versus $0.52 in the second quarter of fiscal year 2021 and $0.29 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $0.50 versus $0.63 in the second quarter of fiscal year 2021 and $0.84 in the same quarter of last year.
- Cash flow used in operations of $124 million and capital expenditures of $19 million.

59.    On August 10, 2021, SMCI issued a press release announcing the Company's financial results for its fourth quarter and full fiscal year 2021 (the "2021 Release"), which reported that:

Net sales for the fiscal year ended June 30, 2021, were $3.56 billion versus $3.34 billion for the fiscal year ended June 30, 2020. Net income for fiscal year 2021 was $112 million, or $2.09 per diluted share, versus $84 million, or $1.60 per diluted share, for fiscal year 2020. Non-GAAP net income for the fiscal year 2021 was $136 million, or $2.48 per diluted share, versus $150 million, or $2.77 per diluted share, for fiscal year 2020. Non-GAAP net income for the fiscal year 2021 adds back stock-based compensation expense of $28.5 million, special performance bonuses of $5.8 million, executive SEC settlement credit of $2.1 million, and controls remediation costs and other expenses of $1.3 million, less tax effects of $9.0 million.

60.    The 2021 Release further provided the following financial guidance for fiscal year 2022:

The Company expects net sales of $4.1 billion to $4.5 billion, GAAP net income per diluted share of at least $2.60 and non-GAAP net income per diluted share of at least $3.00 for fiscal year 2022 ending June 30, 2022. The Company's projections for GAAP and non-GAAP net income per diluted share both assume a tax rate of approximately 16% and a fully diluted share count of 55.3 million shares for GAAP and fully diluted share count of 56.5 million shares for non-GAAP. The outlook for fiscal year 2022 GAAP net income per diluted share includes approximately $30 million in expected stock-based compensation expense and other expenses that are excluded from non-GAAP net income per diluted share.

61.    On August 27, 2021, the Company filed its fiscal year 2021 annual report on Form 10-K with the SEC (the "2021 Form 10-K"), signed by Defendants Liang, Weigand, Sara Liu, Fairfax, Tseng, Tuan, Chan, and Tally Liu. With respect to the Company's related party transactions, the 2021 Form 10-K disclosed the following:

We use Ablecom, a related party, for contract design and manufacturing coordination support and warehousing, and Compuware, also a related party and an affiliate of Ablecom, for distribution, contract manufacturing and warehousing. We work with Ablecom to optimize modular designs for our chassis and certain of other

components. We outsource to Compuware a portion of our design activities and a significant part of our manufacturing of subassemblies, particularly power supplies. Our purchases of products from Ablecom and Compuware represented 7.8%, 10.1% and 9.2% of our cost of sales for fiscal years 2021, 2020 and 2019, respectively. Ablecom and Compuware's sales to us constitute a substantial majority of Ablecom and Compuware's net sales. Ablecom and Compuware are both privately-held Taiwan-based companies. In addition, we have entered into a distribution agreement with Compuware, under which we have appointed Compuware as a nonexclusive distributor of our products in Taiwan, China and Australia.

Steve Liang, Ablecom's Chief Executive Officer and largest shareholder, is the brother of Charles Liang, our President, Chief Executive Officer and Chairman of our Board of Directors ("the Board"). Steve Liang owned no shares of our common stock as of June 30, 2021, 2020 or 2019. Charles Liang and his spouse, Sara Liu, our Co-Founder, Senior Vice President and Director, jointly owned approximately 10.5% of Ablecom's capital stock, while Mr. Steve Liang and other family members owned approximately 28.8% of Ablecom's outstanding common stock as of June 30, 2021. Bill Liang, a brother of both Charles Liang and Steve Liang, is a member of the Board of Directors of Ablecom as well.

In October 2018, our Chief Executive Officer, Charles Liang, personally borrowed approximately $12.9 million from Chien-Tsun Chang, the spouse of Steve Liang. The loan is unsecured, has no maturity date and bore interest at 0.8% per month for the first six months, increased to 0.85% per month through February 28, 2020, and reduced to 0.25% effective March 1, 2020. The loan was originally made at Mr. Liang's request to provide funds to repay margin loans to two financial institutions, which loans had been secured by shares of our common stock that he held. The lenders called the loans in October 2018, following the suspension of our common stock from trading on NASDAQ in August 2018 and the decline in the market price of our common stock in October 2018. As of June 30, 2021, the amount due on the unsecured loan (including principal and accrued interest) was approximately $15.3 million.

Bill Liang is also the Chief Executive Officer of Compuware, a member of Compuware's Board of Directors and a holder of a significant equity interest in Compuware. Steve Liang is also a member of Compuware's Board of Directors and is an equity holder of Compuware.

* * *

The Company has entered into a series of agreements with Ablecom, including multiple product development, production and service agreements, product manufacturing agreements, manufacturing services agreements and lease agreements for warehouse space.

Under these agreements, the Company outsources to Ablecom a portion of its design activities and a significant part of its server chassis manufacturing as well as an immaterial portion of other components. ***Ablecom manufactured approximately 91.8%, 95.5% and 96.3% of the chassis included in the products sold by the Company during fiscal years 2021, 2020 and 2019, respectively***. With respect to design activities, Ablecom generally agrees to design certain agreed-upon products according to the Company's specifications, and further agrees to build the tools needed to manufacture the products. The Company pays Ablecom for the design and engineering services, and further agrees to pay Ablecom for the tooling. The Company retains full ownership of any intellectual property resulting from the design of these products and tooling.

With respect to the manufacturing aspects of the relationship, Ablecom purchases most of materials needed to manufacture the chassis from third parties and ***the Company provides certain components used in the manufacturing process (such as power supplies) to Ablecom through consignment or sales transactions***. ***Ablecom uses these materials and components to manufacture the completed chassis and then sell them back to the Company***. For the components purchased from the Company, Ablecom sells the components back to the Company at a price equal to the price at which the Company sold the components to Ablecom. The Company and Ablecom frequently review and negotiate the prices of the chassis the Company purchases from Ablecom. In addition to inventory purchases, the Company also incurs other costs associated with design services, tooling and other miscellaneous costs from Ablecom.

\* \* \*

The Company has entered into a distribution agreement with Compuware, under which the Company appointed Compuware as a non-exclusive distributor of the Company's products in Taiwan, China and Australia. Compuware assumes the responsibility to install the Company's products at the site of the end customer, if required, and administers customer support in exchange for a discount from the Company's standard price for its purchases.

The Company also has entered into a series of agreements with Compuware, including a multiple product development, production and service agreements, product manufacturing agreements, and lease agreements for office space.

Under these agreements, the Company outsources to Compuware a portion of its design activities and a significant part of its power supplies manufacturing as well as an immaterial portion of other components. With respect to design activities, Compuware generally agrees to design certain agreed-upon products according to the Company's specifications, and further agrees to build the tools needed to manufacture the products. The Company pays Compuware for the design and engineering services, and further agrees to pay Compuware for the tooling. The Company retains full ownership of any intellectual property resulting from the

design of these products and tooling. With respect to the manufacturing aspects of the relationship, Compuware purchases most of materials needed to manufacture the power supplies from outside markets and uses these materials to manufacture the products and then sell those products to the Company. The Company and Compuware frequently review and negotiate the prices of the power supplies the Company purchases from Compuware.

Compuware also manufactures motherboards, backplanes and other components used on printed circuit boards for the Company. ***The Company sells to Compuware most of the components needed to manufacture the above products. Compuware uses the components to manufacture the products and then sells the products back to the Company at a purchase price equal to the price at which the Company sold the components to Compuware, plus a "manufacturing value added" fee and other miscellaneous material charges and costs.*** The Company and Compuware frequently review and negotiate the amount of the "manufacturing value added" fee that will be included in the price of the products the Company purchases from Compuware. In addition to the inventory purchases, the Company also incurs costs associated with design services, tooling assets, and miscellaneous costs.

* * *

The Company's net sales to Ablecom were not material for the fiscal years ended June 30, 2021, 2020 and 2019.

* * *

***Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. For fiscal years ended June 30, 2021, 2020 and 2019, we purchased products from Ablecom totaling $122.2 million, $152.5 million and $137.9 million, respectively***. Amounts owed to Ablecom by us as of June 30, 2021 and 2020, were $41.2 million and $40.1 million, respectively. For the fiscal years ended June 30, 2021, 2020 and 2019, we paid Ablecom $8.6 million, $7.6 million and $7.4 million, respectively, for design services, tooling assets and miscellaneous costs.

***Compuware's sales of our products to others comprise a majority of Compuware's net sales. For fiscal years ended June 30, 2021, 2020 and 2019, we sold products to Compuware totaling $27.9 million, $23.9 million and $17.7 million, respectively***. Amounts owed to us by Compuware as of June 30, 2021 and 2020, were $18.4 million and $14.3 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. ***For the fiscal years ended June 30, 2021, 2020 and 2019, we purchased products from Compuware totaling $113.4 million, $130.6 million and $138.9 million, respectively***. Amounts we owed to Compuware as of June 30, 2021 and 2020, were

$46.4 million and $46.5 million, respectively. For the fiscal years ended June 30, 2021, 2020 and 2019, we paid Compuware $1.8 million, $1.2 million and $0.7 million, respectively, for design services, tooling assets and miscellaneous costs.[2]

62.    On November 2, 2021, SMCI issued a press release announcing the Company's financial results for its first fiscal quarter of 2022 (the "1Q2022 Release"), which reported the following results:

- Net sales of $1.03 billion versus $1.07 billion in the fourth quarter of fiscal year 2021 and $762 million in the same quarter of last year.
- Gross margin of 13.4% versus 13.6% in the fourth quarter of fiscal year 2021 and 17.0% in the same quarter of last year.
- Net income of $25 million versus $39 million in the fourth quarter of fiscal year 2021 and $27 million in the same quarter of last year.
- Diluted net income per common share of $0.48 versus $0.74 in the fourth quarter of fiscal year 2021 and $0.49 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $0.58 versus $0.81 in the fourth quarter of fiscal year 2021 and $0.55 in the same quarter of last year.
- Cash flow used in operations of $135 million and capital expenditures of $12 million.

63.    On February 1, 2022, SMCI issued a press release announcing the Company's financial results for its second fiscal quarter of 2022 (the "2Q2022 Release"), which reported the following results:

- Net sales of $1.17 billion versus $1.03 billion in the first quarter of fiscal year 2022 and $830 million in the same quarter of last year.
- Gross margin of 14.0% versus 13.4% in the first quarter of fiscal year 2022 and 16.4% in the same quarter of last year.
- Net income of $42 million versus $25 million in the first quarter of fiscal year 2022 and $28 million in the same quarter of last year.
- Diluted net income per common share of $0.78 versus $0.48 in the first quarter of fiscal year 2022 and $0.52 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $0.88 versus $0.58 in the first quarter of fiscal year 2022 and $0.63 in the same quarter of last year.
- Cash flow used in operations for the second quarter of fiscal year 2022 of $53 million and capital expenditures of $12 million.

64.    On May 3, 2022, SMCI issued a press release announcing the Company's financial results for its second fiscal quarter of 2022 (the "2Q2022 Release"), which reported the following

---

[2] Unless indicated otherwise, all emphasis is added.

results:

- Net sales of $1.36 billion versus $1.17 billion in the second quarter of fiscal year 2022 and $896 million in the same quarter of last year.
- Gross margin of 15.5% versus 14.0% in the second quarter of fiscal year 2022 and 13.7% in the same quarter of last year.
- Net income of $77 million versus $42 million in the second quarter of fiscal year 2022 and $18 million in the same quarter of last year.
- Diluted net income per common share of $1.43 versus $0.78 in the second quarter of fiscal year 2022 and $0.35 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $1.55 versus $0.88 in the second quarter of fiscal year 2022 and $0.50 in the same quarter of last year.
- Cash flow used in operations for the third quarter of fiscal year 2022 of $228 million and capital expenditures of $11 million.

65.     On May 6, 2022, SMCI filed a quarterly report on Form 10-Q with the SEC for its third fiscal quarter of 2022, which discussed the "crisis in eastern Europe" and expressly stated that the Company had "paused sales to Russia":

The crisis in eastern Europe continues to be a challenge to global companies, including us, which have customers in the impacted regions. The U.S. and other global governments have placed restrictions on how companies may transact with businesses in these regions, particularly Russia, Belarus and restricted areas in Ukraine. ***Because of these restrictions and the growing logistical and other challenges, we have paused sales to Russia, Belarus and the restricted areas in Ukraine***. This decision, which is in line with the approach of other global technology companies, helps us comply with our obligations under the various requirements in the U.S. and around the world.

\* \* \*

We do not make a material portion of our sales or acquire a material portion of our parts or components directly from impacted regions.

\* \* \*

No assurances can be given that additional developments in the impacted regions, and responses thereto from the U.S. and other global governments, would not have a material adverse effect on our business, results of operations and financial condition.

66.     On August 9, 2022, SMCI issued a press release announcing the Company's financial results for its fourth quarter and full fiscal year 2022 (the "2022 Release"), which quoted Defendant Liang as stating:

The Supermicro team has attained yet another milestone by achieving $5.2 billion in annual revenue . . . The ramp up of recent design wins and top tier customers adopting our plug and play ("PNP") rack-scale solutions have given us momentum

going into fiscal year 2023. We are well on our way to becoming the leading global supplier of rack-scale Total IT Solutions, powering the world's digital transformation across diverse applications in key market segments including AI, enterprise, cloud, edge/telco and others.

67.    With respect to the Company's annual financial results, the 2022 Release stated:

Net sales for the fiscal year ended June 30, 2022, were $5.20 billion versus $3.56 billion for the fiscal year ended June 30, 2021. Net income for fiscal year 2022 was $285 million, or $5.32 per diluted share, versus $112 million, or $2.09 per diluted share, for fiscal year 2021. Non-GAAP net income for the fiscal year 2022 was $311 million, or $5.65 per diluted share, versus $136 million, or $2.48 per diluted share, for fiscal year 2021. Non-GAAP net income for the fiscal year 2022 adds back stock-based compensation expense of $32.8 million, litigation expenses of $4.4 million, $2.0 million of litigation settlement costs, and $0.5 million of special performance bonuses, net of the related tax effects.

68.    The 2022 Release further provided the following financial guidance for fiscal year 2023:

For fiscal year 2023 ending June 30, 2023, the Company expects net sales of $6.2 billion to $7.0 billion, GAAP net income per diluted share of at least $7.27 and non-GAAP net income per diluted share of at least $7.50. The Company's projections for GAAP and non-GAAP net income per diluted share assume a tax rate of approximately 20.3% and 21.1%, respectively, and a fully diluted share count of 55.6 million shares for GAAP and fully diluted share count of 57.0 million shares for non-GAAP. The outlook for fiscal year 2023 GAAP net income per diluted share includes approximately $35.4 million in expected stock-based compensation expense and other expenses, net of related tax effects that are excluded from non-GAAP net income per diluted share.

69.    On August 29, 2022, the Company filed its fiscal year 2022 annual report on Form 10-K with the SEC (the "2022 Form 10-K"), signed by Defendants Liang, Weigand, Sara Liu, Fairfax, Lin, Tuan, Chan, and Tally Liu. With respect to the Company's related party transactions, the 2022 Form 10-K disclosed the following:

Ablecom manufactured approximately 88.2%, 91.8% and 95.5% of the chassis included in the products sold by the Company during fiscal years 2022, 2021 and 2020, respectively.

* * *

Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. **For fiscal years ended June 30, 2022**, 2021 and 2020, **we purchased products from Ablecom totaling $192.4 million**, $122.2 million and $152.5 million, respectively. Amounts owed to Ablecom by us as of June 30, 2022, 2021 and 2020, were $46.0

million, $41.2 million and $40.1 million, respectively. ***For the fiscal years ended June 30, 2022***, 2021 and 2020, ***we paid Ablecom $8.3 million,*** $8.6 million and $7.6 million, respectively, for design services, tooling assets and miscellaneous costs.

Compuware's sales of our products to others comprise a majority of Compuware's net sales. ***For fiscal years ended June 30, 2022***, 2021 and 2020, ***we sold products to Compuware totaling $26.1 million***, $27.9 million and $23.9 million, respectively. Amounts owed to us by Compuware as of June 30, 2022, 2021 and 2020, were $20.0 million, $18.4 million and $14.3 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. ***For the fiscal years ended June 30, 2022***, 2021 and 2020, ***we purchased products from Compuware totaling $170.3 million***, $113.4 million and $130.6 million, respectively. Amounts we owed to Compuware as of June 30, 2022, 2021 and 2020 were $60.0 million, $46.4 million and $46.5 million, respectively. For the fiscal years ended June 30, 2022, 2021 and 2020, we paid Compuware $1.5 million, $1.8 million and $1.2 million, respectively, for design services, tooling assets and miscellaneous costs.

70. On November 1, 2022, SMCI issued a press release announcing the Company's financial results for its first fiscal quarter of 2023 (the "2Q2023 Release"), which reported the following results:

- Net sales of $1.85 billion versus $1.64 billion in the fourth quarter of fiscal year 2022 and $1.03 billion in the same quarter of last year.
- Gross margin of 18.8% versus 17.6% in the fourth quarter of fiscal year 2022 and 13.4% in the same quarter of last year.
- Net income of $184 million versus $141 million in the fourth quarter of fiscal year 2022 and $25 million in the same quarter of last year.
- Diluted net income per common share of $3.35 versus $2.60 in the fourth quarter of fiscal year 2022 and $0.48 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $3.42 versus $2.62 in the fourth quarter of fiscal year 2022 and $0.58 in the same quarter of last year.
- Cash flow provided by operations for the first quarter of fiscal year 2023 of $314 million and capital expenditures of $11 million.

71. On January 31, 2023, SMCI issued a press release announcing the Company's financial results for its second fiscal quarter of 2023 (the "2Q2023 Release"), which reported the following results:

- Net sales of $1.80 billion versus $1.85 billion in the first quarter of fiscal year 2023 and $1.17 billion in the same quarter of last year.
- Gross margin of 18.7% versus 18.8% in the first quarter of fiscal year 2023 and 14.0% in the same quarter of last year.
- Net income of $176 million versus $184 million in the first quarter of fiscal year 2023 and $42 million in the same quarter of last year.
- Diluted net income per common share of $3.14 versus $3.35 in the first quarter of fiscal year 2023 and $0.78 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $3.26 versus $3.42 in the first quarter of fiscal year 2023 and $0.88 in the same quarter of last year.
- Cash flow provided by operations for the second quarter of fiscal year 2023 of $161 million and capital expenditures of $10 million.

72.    On April 14, 2023, the Company filed a Proxy Statement on Form DEF 14A with the SEC (the "2023 Proxy") soliciting shareholder approval for, *inter alia*, the re-election of Defendants Liang, Tuan, and Liu to serve for another three-year term on the Company's Board and the compensation of certain of the Company's executive officers including Defendants Liang and Weigand.

73.    With respect to the Company's related party dealings, the 2023 Proxy reiterated the following:

Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. For fiscal years ended June 30, 2022, 2021 and 2020, we purchased products from Ablecom totaling $192.4 million, $122.2 million and $152.5 million, respectively. Amounts owed to Ablecom by us as of June 30, 2022, 2021 and 2020, were $46.0 million, $41.2 million and $40.1 million, respectively. For the fiscal years ended June 30, 2022, 2021 and 2020, we paid Ablecom $8.3 million, $8.6 million and $7.6 million, respectively, for design services, tooling assets and miscellaneous costs.

Compuware's sales of our products to others comprise a majority of Compuware's net sales. For fiscal years ended June 30, 2022, 2021 and 2020, we sold products to Compuware totaling $26.1 million, $27.9 million and $23.9 million, respectively. Amounts owed to us by Compuware as of June 30, 2022, 2021 and 2020, were $20.0 million, $18.4 million and $14.3 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. For the fiscal years ended June 30, 2022, 2021 and 2020, we purchased products from Compuware totaling $170.3 million, $113.4 million and $130.6 million, respectively. Amounts we owed to Compuware as of June 30, 2022, 2021 and 2020

were $60.0 million, $46.4 million and $46.5 million, respectively. For the fiscal years ended June 30, 2022, 2021 and 2020, we paid Compuware $1.5 million, $1.8 million and $1.2 million, respectively, for design services, tooling assets and miscellaneous costs.

74.    With respect to risk oversight, the 2023 Proxy stated:

The Board conducts this oversight directly and through its committees. The Board has delegated primary responsibility for oversight of risks relating to financial controls and reporting to our Audit Committee. The Audit Committee also assists the Board in oversight of certain other risks, including internal controls and review of related party transactions. The Audit Committee reports to the full Board on such matters as appropriate.

75.    The statements issued in the 2023 Proxy were materially false and misleading because they failed to disclose the extent of the relationship between SMCI and Ablecom and between SMCI and Compuware. Further, despite the 2023 Proxy's descriptions of the Board's and its committees' oversight responsibilities with respect to risk oversight, internal controls over financial reporting, and review of related party transactions, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements

76.    On May 2, 2023, SMCI issued a press release announcing the Company's financial results for its third fiscal quarter of 2023 (the "3Q2023 Release"), which reported the following results:

- Net sales of $1.28 billion versus $1.80 billion in the second quarter of fiscal year 2023 and $1.36 billion in the same quarter of last year.
- Gross margin of 17.6% versus 18.7% in the second quarter of fiscal year 2023 and 15.5% in the same quarter of last year.
- Net income of $86 million versus $176 million in the second quarter of fiscal year 2023 and $77 million in the same quarter of last year.
- Diluted net income per common share of $1.53 versus $3.14 in the second quarter of fiscal year 2023 and $1.43 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $1.63 versus $3.26 in the second quarter of fiscal year 2023 and $1.55 in the same quarter of last year.
- Cash flow provided by operations for the third quarter of fiscal year 2023 of $198 million and capital expenditures of $8 million.

77.    On August 8, 2023, the Company issued a press release announcing the Company's financial results for its fourth quarter and full fiscal year 2023 (the "2023 Release"),

which reported the following results:

> Net sales for the fiscal year ended June 30, 2023, were $7.12 billion versus $5.20 billion for the fiscal year ended June 30, 2022. Net income for fiscal year 2023 was $640 million, or $11.43 per diluted share, versus $285 million, or $5.32 per diluted share, for fiscal year 2022. Non-GAAP net income for fiscal year 2023 was $673 million, or $11.81 per diluted share, versus $311 million, or $5.65 per diluted share, for fiscal year 2022. Non-GAAP net income for fiscal year 2023 adds back stock-based compensation expense of $54 million and litigation recovery of $4 million, net of the related tax effects of $17 million.

78.    In the 2023 Release, Defendant Liang touted the purported sustainability of the Company's revenue growth:

> Supermicro's record revenue and 37% year-over-year growth for fiscal year 2023 validates our global leadership position in AI accelerated compute platforms . . . We continue to see unprecedented demand for AI and other advanced applications requiring optimized rack-scale solutions. We are in a great position to continue our growth momentum given our record new design wins, customers, and backlog for our best-in-class rack-scale Total AI & IT Solutions.

79.    With respect to the Company's fiscal 2024 guidance, the Release stated that "[f]or fiscal year 2024 ending June 30, 2024, the Company expects net sales of $9.5 billion to $10.5 billion."

80.    On August 28, 2023, the Company filed its fiscal year 2023 annual report on Form 10-K with the SEC (the "2022 Form 10-K"), signed by Defendants Liang, Weigand, Sara Liu, Fairfax, Lin, Blair, Tuan, Chan, and Tally Liu. With respect to the Company's related party transactions, the 2023 Form 10-K disclosed the following:

> Ablecom manufactured approximately 91.9%, 88.2% and 91.8% of the chassis included in the products sold by the Company during fiscal years 2023, 2022 and 2021, respectively.
>
> * * *
>
> Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. ***For fiscal years ended June 30, 2023***, 2022 and 2021, ***we purchased products from Ablecom totaling $167.8 million***, $192.4 million and $122.2 million, respectively. Amounts owed to Ablecom by us as of June 30, 2023, 2022 and 2021, were $36.9 million, $46.0 million and $41.2 million, respectively. For the fiscal years ended June 30, 2023, 2022 and 2021, we paid Ablecom $12.1 million, $8.3 million and $8.6 million, respectively, for design services, tooling assets and miscellaneous costs.

Compuware's sales of our products to others comprise a majority of Compuware's net sales. **For fiscal years ended June 30, 2023**, 2022 and 2021, **we sold products to Compuware totaling $36.3 million**, $26.1 million and $27.9 million, respectively. Amounts owed to us by Compuware as of June 30, 2023, 2022 and 2021, were $24.9 million, $19.6 million and $18.2 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. **For the fiscal years ended June 30, 2023**, 2022 and 2021, **we purchased products from Compuware totaling $217.0 million**, $170.3 million and $113.4 million, respectively. Amounts we owed to Compuware as of June 30, 2023, 2022 and 2021 were $66.2 million, $60.0 million and $46.4 million, respectively. For the fiscal years ended June 30, 2023, 2022 and 2021, we paid Compuware $2.0 million, $1.5 million and $1.8 million, respectively, for design services, tooling assets and miscellaneous costs.

81.    The 2023 Form 10-K further stated that "no sales of any products actually occurred in the Russian Federation during fiscal year 2023," specifically stating that the "Company and its subsidiaries had last recorded revenue from Russia on February 23, 2022."

82.    With respect to the Company's internal controls over financial reporting, the 2023 Form 10-K stated:

Management, including our CEO and CFO, assessed our internal control over financial reporting as of June 30, 2023. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in its Internal Control - Integrated Framework (2013) (the "COSO Framework"). Based on this assessment, management has concluded that our internal control over financial reporting was effective as of June 30, 2023, to provide reasonable assurance regarding the reliability of financial reporting and preparation of consolidated financial statements in accordance with U.S. GAAP.

83.    On November 1, 2023, SMCI issued a press release announcing the Company's financial results for its first fiscal quarter of 2024 (the "3Q2024 Release"), which reported the following results:

- Net sales of $2.12 billion versus $2.18 billion in the fourth quarter of fiscal year 2023 and $1.85 billion in the same quarter of last year.
- Gross margin of 16.7% versus 17.0% in the fourth quarter of fiscal year 2023 and 18.8% in the same quarter of last year.
- Net income of $157 million versus $194 million in the fourth quarter of fiscal year 2023 and $184 million in the same quarter of last year.

- Diluted net income per common share of $2.75 versus $3.43 in the fourth quarter of fiscal year 2023 and $3.35 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $3.43 versus $3.51 in the fourth quarter of fiscal year 2023 and $3.42 in the same quarter of last year.
- Cash flow provided by operations for the first quarter of fiscal year 2024 of $271 million and capital expenditures of $3 million.

84.    On December 8, 2023, SMCI announced the appointment of Defendant Liaw to the Board and explained his history with the Company:

Mr. Liaw co-founded the Company in 1993. From the Company's founding until January 2018, Mr. Liaw was an employee and held various executive positions in the Company, including Senior Vice President of Worldwide Sales and Corporate Secretary. He was also a member of the Board of Directors from 1993 until January 2018. ***In January 2018, Mr. Liaw resigned from all his positions with the Company, including from the Board of Directors, during a period when the Company was not current in its filings with the Securities and Exchange Commission, and, following completion of an Audit Committee investigation, in connection with a restructuring of the Company's sales organization as part of the Company's remediation of material weaknesses in its internal control over financial reporting***. From February 2018 until June 2020, Mr. Liaw was retired. From June 2020 until April 2021, Mr. Liaw was the president of 2CRSi Corporation, a company headquartered in Strasbourg, France that develops, produces and sells high-performance customized, environmentally-friendly servers. ***Mr. Liaw returned to the Company as a consultant in May 2021***, advising the Company with respect to business development matters. ***In August 2022, Mr. Liaw returned to full-time employment with the Company as Senior Vice President, Business Development.***

85.    On January 29, 2024, SMCI issued a press release announcing the Company's financial results for its second fiscal quarter of 2024 (the "2Q2024 Release"), which reported the following results:

- Net sales of $3.66 billion versus $2.12 billion in the first quarter of fiscal year 2024 and $1.80 billion in the same quarter of last year.
- Gross margin of 15.4% versus 16.7% in the first quarter of fiscal year 2024 and 18.7% in the same quarter of last year.
- Net income of $296 million versus $157 million in the first quarter of fiscal year 2024 and $176 million in the same quarter of last year.
- Diluted net income per common share of $5.10 versus $2.75 in the first quarter of fiscal year 2024 and $3.14 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $5.59 versus $3.26 in the first quarter of fiscal year 2024 and $3.26 in the same quarter of last year.
- Cash flow used in operations for the second quarter of fiscal year 2024 of $595 million and capital expenditures of $15 million.

86.    On April 30, 2024, SMCI issued a press release announcing the Company's

financial results for its third fiscal quarter of 2024 (the "3Q2024 Release"), which reported the following results:

- Net sales of $3.85 billion versus $3.66 billion in the second quarter of fiscal year 2024 and $1.28 billion in the same quarter of last year.
- Gross margin of 15.5% versus 15.4% in the second quarter of fiscal year 2024 and 17.6% in the same quarter of last year.
- Net income of $402 million versus $296 million in the second quarter of fiscal year 2024 and $86 million in the same quarter of last year.
- Diluted net income per common share of $6.56 versus $5.10 in the second quarter of fiscal year 2024 and $1.53 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $6.65 versus $5.59 in the second quarter of fiscal year 2024 and $1.63 in the same quarter of last year.
- Cash flow used in operations for the third quarter of fiscal year 2024 of $1,520 million and capital expenditures of $93 million.

87.    On August 6, 2024, the Company issued a press release announcing the Company's financial results for its fourth quarter and full fiscal year 2024 (the "2024 Release"), which reported the following results:

Net sales for the fiscal year ended June 30, 2024, were $14.94 billion versus $7.12 billion for the fiscal year ended June 30, 2023. Net income for fiscal year 2024 was $1.21 billion, or $20.09 per diluted share, versus $640 million, or $11.43 per diluted share, for fiscal year 2023. Non-GAAP net income for fiscal year 2024 was $1.34 billion, or $22.09 per diluted share, versus $673 million, or $11.81 per diluted share, for fiscal year 2023. Non-GAAP net income for fiscal year 2024 adds back stock-based compensation expense of $135 million, net of the related tax effects of $93 million.

88.    The 2024 Release quoted Defendant Liang as stating:

We are well positioned to become the largest IT infrastructure company, driven by our technology leadership including rack-scale DLC liquid cooling and business values of our new Datacenter Building Block Solutions. The investments in Malaysia and Silicon Valley expansions will further strengthen our supply chain, security, and economies of scale necessary for the growing AI revolution.

89.    The statements identified above in ¶¶56-88 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company lacked adequate accounting procedures and controls and had engaged in numerous accounting improprieties including issues related to revenue recognition; (ii) the Company had engaged in undisclosed related-party transactions; (iii)

the Company had been exporting large volumes of product to Russia in contravention of United States trade restrictions due to the Russian invasion of Ukraine; and (v) as a result of the foregoing, the Company's financial results were misstated, and positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

90.    On August 27, 2024, Hindenburg issued a report titled "Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at this AI High Flyer" (the "Report") which revealed "glaring accounting red flags, evidence of undisclosed related party transactions, sanctions and export control failures, and customer issues."

91.    The Report discussed SEC allegations that the Company had improperly recognized over $200,000,000 in revenue in August 2020. Specifically, the SEC alleged that the Company had "improperly accelerated revenue recognition and reporting" by manipulating product shipment logistics, dates, and terms to recognize revenues from product shipments earlier than they should have been under Generally Accepted Accounting Principles ("GAAP"). The Company was forced to pay $17.5 million to the SEC to settle the claims.

92.    While the Company initially terminated several employees that were involved in the accounting scandal, the Report revealed that many of those employees were rehired shortly thereafter, and the Company's accounting violations continued:

> When we spoke to former Super Micro executives, they told us Wally Liaw presided over the sales teams that were involved in the previous accounting violations: "If you go back to Wally's team, every one of those [people] has their hand in that mess. You can promise yourself that"

> One former executive told us they had questioned the decision to rehire Wally, asking at the time: "***Why are we having this conversation about Wally coming back as a contractor?*** So when I saw him come back I had the same thought, like, wow, that's, uh, that's interesting."

> Normally, leaving amid an accounting scandal would be the end of an executive's association with a form. Yet a recent media report in April 2024 by Asia University,

Taiwan, reported that Phidias Chou attended a Super Micro meeting with CEO Charles Liang, where Chou was vaguely identified as "deputy CEO." . . . In another article, describing the same meeting, he was simply referred to as a "consultant."

\* \* \*

A former executive told us [that Salim Fedel was also associated with unlawful activities]: "He was involved with the restatement. He was one of the sloppy salespeople. He got fired because he was so aggressive." . . . Super Micro rehired him as Vice President of Business Development and Strategic Sales in October 2020, per his LinkedIn.

\* \* \*

[Howard] Hideshima was rehired as a consultant in May 2023 to a related party entity of Super Micro called Ablecom Technology, according to his LinkedIn profile. Ablecom is led by Super Micro CEO Charles Liang's brother. Super Micro's CEO and his wife own 10.5%. The entity has hundreds of millions of dollars in transactions with Super Micro per year, per its 10-k.

\* \* \*

Former employees explained how these rehires were borne out of long-standing relationships with CEO Charles Liang, who valued loyalty over all else. Per one former sales director: "I wouldn't take comfort in that. If people were let go because their practices were questionable, to bring them back would give me less comfort. I don't think the behavior of the company in many ways has changed in the 5 years since I started, and I started shortly after the delisting problem. Another sales director attributed it to nepotism: "They were hired back. And there was a lot of nepotism. I'm speaking freely."

\* \* \*

Our interviews with former employees corroborate that Super Micro continued recognizing incomplete sales as revenue after the SEC Settlement in 2020.
Pressure to meet quotas pushed salespeople to stuff the channel with distributors, using "partial shipments," per former sales director.

[Former employees] told us salespeople worked with distributors of Super Micro, including Avnet and Tech Data to over-ship product to boost numbers, in what appeared to be a channel stuffing scheme. This resulted from sales teams being put under "massive pressure" from Charles Liang each quarter.

\* \* \*

Our interviews also corroborate further revenue recognition issues related to shipping highly defective products around quarter-end

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

93.     The Report cites a lawsuit brought by the Company's former Head of Global Services, Bob Luong, which alleged, among other things, that: (i) Revenue was incorrectly allocated to hardware sales rather than service, in the quarter ending December 2020, to artificially boost reported profit margins; (ii) Revenue was prematurely booked even when equipment could not be delivered to and installed for customers; and (iii) Revenue was prematurely booked even when products were faulty or not ready for sale.

94.     The Report revealed that certain of the Company's disclosed related party dealings were highly problematic:

> Ablecom was founded in 1997, per its website. Its CEO and largest shareholder is Steve (Jianfa) Liang, a younger brother of Super Micro's CEO Charles Liang, per the company's 2023 annual report. Steve Liang owns 28.8% of Ablecom shares along with unnamed "other family members." Super Micro CEO Charles Liang, and his wife, who is also a director at Super Micro, own 10.5% of Ablecom shares. An unnamed sibling of co-founder Wally Liaw owns 11.7%, per filings.

> Compuware was founded in 2004, per its website. Its CEO is Bill (Jianda) Liang, also a younger brother of Super Micro's CEO, per the company's 2023 10-K. Brother Steve Liang [of Ablecom] is also a director and shareholder of Compuware. As of April 2024, Bill Liang and his immediate family owned 15.83% of Compuware while elder brother Steve Liang and his wife and immediate family owned a much larger 37.67% stake, per shareholdings disclosed in filings by one of its investees. Ablecom owned a 15% stake in Compuware.

> Both Ablecom and Compuware are collocated with Super Micro's facility in Taiwan.

> * * *

> [B]oth Ablecom and Compuware's global export sales appear highly concentrated on Super Micro and the U.S., based on available import-expert records via Tradesparq, which may not cover all import markets.

> Our analysis of those records shows that of Ablecom's exports to the U.S., ~99.8% were to Super Micro between January 1st, 2020 and June 30th, 2024 (the end of Super Micro's fiscal year).

> Reflecting a similar pattern, in the same period, 99.7% of Compuware's exports to the U.S. were to Super Micro, based on available Tradesparq data.

In short, these related party suppliers have almost no business in the U.S. – and apparently very little elsewhere in the world – apart from Super Micro, suggesting they were set up as extensions of the public company.

A former engineer at Ablecom confirmed the conclusions we drew from the trade data. They told us via written message: "Ablecom is a very special supplier of chassis and thermal module to SMC [Super Micro]...Ablecom has about 90% revenue comes from SMC [Super Micro]." The engineer also indicated that Super Micro CEO Charles Liang was the person calling the shots at Ablecom and Compuware: "SMC [Super Micro], Ablecom and Compuware have a regular operation meeting hosted by Charles Liang." They said the operation meeting was held monthly and went on to explain that "Steve [Liang] and Bill [Liang] are in charge of chassis and PSU [power supply unit], respectively."

95.     The Report further revealed previously undisclosed related party dealings:

In addition to the concerns around the disclosed related parties, we found evidence of undisclosed related parties. The youngest brother of Super Micro's CEO owns two Taiwan-based entities that make server components. Media reports and former employees indicate the entities are Super Micro suppliers.

Both entities operate out of the Super Micro Science and Technology Park in Taiwan, but Super Micro has not disclosed related party transactions with them. Another brother of Super Micro's CEO operates a disclosed related party but is also the director and shareholder of undisclosed Hong Kong and Taiwanese entities, which appear to resell Super Micro products and provide "professional OEM services." It operates out of the same building as related party Compuware.

In addition to the CEO's brothers, the company has an odd relationship with a key customer. In February 2024, Super Micro made an undisclosed investment in tech startup Lambda Labs as part of its $320 million funding round, per Bloomberg and per a confirmation we received from Lambda's COO.

In October 2023, two related parties run by CEO Liang's brothers, one of them partially owned by Super Micro's CEO, reportedly invested in small Taiwanese tech company Leadtek. Leadtek's website advertises products almost identical to Super Micro's, yet Super Micro discloses no relationship with Leadtek in what appears to be a clear undisclosed related party.

96.     The Report additionally revealed that the Company had been circumventing United States export restrictions:

***Super Micro products have been shipped to Russia in larger-than-ever volumes since the invasion of Ukraine*****,** based on our analysis of more than 45,000 import and export transactions provided by trade aggregator Tradesparq.

* * *

In calendar year 2023, exports of Super Micro products to Russia rose to $126.6 million – 9.6x higher than in 2021 – per Tradesparq data. *That value was equivalent to 4.9% of Super Micro's total worldwide sales, excluding the U.S., in calendar 2023*, per filings.

* * *

We believe that all the common-sense indicators suggest that Super Micro continued to knowingly supply one of its longstanding Russian customers first via a California distributor operated by a key executive of one of its authorized partners and later via a web of Turkish shell companies.

Trade data shows Super Micro exporting goods directly to Niagara until February 24th, 2022, the day Russia invaded Ukraine.

Then between July 12th, 2022 and February 8th, 2023, a California entity named Business Development International took over exports of Super Micro products to Niagara – in apparent contravention of U.S. trade restrictions – per import-export data.

In just a little more than 6 months, Business Development International shipped more than $5.8 million of "computing machine devices", "data processing blocks" and "parts and accessories" solely to Niagara Computers in Russia, per Tradesparq.

* * *

Just as California-based Business Development International's export operations were winding down, three recently-created Turkish companies took over shipping Super Micro products to Niagara.
The largest, Koc Gemicilik Ve Tasimacilik, was incorporated on January 11, 2022 – about five weeks before Russia invaded Ukraine, per the Turkish corporate gazette.

* * *

Between March 6, 2023 and December 21, 2023, Koc Gemicilik Ve Tasimacilik exported $32.1 million of Super Micro products solely to Niagara in Russia, per Tradesparq.

In June 2024, Koc Gemicilik Ve Tasimacilik was placed under U.S. sanctions for its role in smuggling restricted items to Russia.

The other two export intermediaries, Alfament Yazilim Teknoloji and AMD Ithalat Ihracat were both incorporated in Turkey within two months of the Russian invasion of Ukraine, per the Turkish corporate gazette.

Neither entity nor their sole shareholders appear to have any significant online presence.

Between January 2023 and October 2023, those two entities shipped a combined $8.3 million of Super Micro components to Niagara, per Tradesparq. The vast majority of those products corresponded to HS trade prefix 8471.50 – items the U.S. says are being diverted for military use.

Newly-created Turkish entities, run by Ukrainian and Russian citizens, with little or no trading history and little or no online presence would have been an unmissable warning sign during even the most rudimentary due diligence and export compliance.

* * *

Between November 2, 2022 and November 14, 2023, Beiliande [an "Authorized Parnter" of SMCI via its partnership program] exported Super Micro products with a declared customs value of approximately $10.25 million to Russia – via both its Shenzhen and Hong Kong operations, per Tradesparq.

The largest single Russian customer supplied by Beiliande was called Asilan, based in St Petersburg, which received goods with a declared customs value of about $3.6 million, per Tradesparq.

* * *

Asilian states on the website that it is a partner of Super Micro, provides a link to Super Micro in Holland and features photos with Asilan personnel carrying boxes marked with the Super Micro logo. Its website features multiple links to what it says are Super Micro servers and data storage systems.

* * *

Moscow-based IT distributor Vneshekostil received about $29.4 million of Super Micro products following Russia′s 2022 invasion of Ukraine, per Tradesparq. It appears to have had no prior trading relationship with Super Micro and received most of the components via a Hong Kong exporter created seven weeks after the war began.

Vneshekostil was sanctioned by the U.S. in September 2023 after it became "one of the largest importers of dual-use chips into Russia", per the U.S. Treasury.

97.    On August 28, 2024, the Company announced that it expected to file a Notification

of Late Filing on Form 12-b25 with respect to its fiscal year 2024 annual report on Form 10-K.

98.    On this news, the price of SMCI's stock declined 21.16% in two days, from a price of $562.51 per share on August 26, 2024 to a price of $443.49 per share on August 28, 2024.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

100.    SMCI is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

101.    Plaintiff is a current shareholder of SMCI and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

102.    A pre-suit demand on the Board of SMCI is futile and, therefore, excused. At the time this action was commenced, the nine-member Board was comprised of Defendants Liang, Sara Liu, Fairfax, Tally Liu, Tuan, Lin, Blair, and Liaw (the "Director Defendants"), along with Susie Giordano, who joined the Board in August 2024 and is not a party to this action. Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least eight of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

103.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

104.    Each of the Director Defendants approved and/or permitted the wrongs alleged

herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

105. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

106. Defendant Liang co-founded the Company and has served as SMCI's President, CEO, and as Chairman of the Board since the Company's inception in September 1993. Defendant Liang is also a major shareholder of the Company. Along with Defendant Sara Liu, Defendant Liang jointly owns 14.3% of the Company's total outstanding common stock. Accordingly, the Company acknowledges that Defendant Liang is a non-independent director.

107. Furthermore, Defendant Liang is not disinterested or independent, and therefore, is incapable of considering a demand because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

108. Defendant Sara Liu co-founded the Company and serves as SVP. Defendant Sara Liu is also a major shareholder of the Company. Along with Defendant Liang, Defendant Sara Liu jointly owns 14.3% of the Company's total outstanding common stock. Accordingly, the Company acknowledges that Defendant Sara Liu is a non-independent director.

109. Defendant Liaw co-founded the Company and has held various executive positions at the Company, including SVP of Worldwide Sales and Corporate Secretary, since its inception. Accordingly, the Company acknowledges that Defendant Liaw is a non-independent director.

110. Defendants Fairfax, Tally Liu, Lin, and Blair serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were

specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

111.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

112.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Director Defendants have sought to enforce the Company's Clawback Policy, which provides for "the prompt recovery or clawback of certain excess incentive-based compensation received during an applicable three-year recovery period by current or former executive officers in the event [SMCI is] required to prepare an accounting restatement due to the material noncompliance with any financial reporting requirement under the securities laws."

113.     Defendants Liang and Sara Liu are particularly indebted to one another as husband and wife. This substantial conflict of interest has precluded Defendants Liang and Sara Liu from calling into question each other's conduct.

114.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

115.     The acts complained of herein constitute violations of fiduciary duties owed by SMCI's officers and directors, and these acts are incapable of ratification.

116.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of SMCI. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of SMCI, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

117.     If there is no directors' and officers' liability insurance, then the directors will not

cause SMCI to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

118.    Thus, for all of the reasons set forth above, at least eight of SMCI's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

<u>**COUNT I**</u>
**Against the Individual Defendants for Violations of § 14(a) of the Exchange Act and Rule 14a-9**

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

121.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy. As alleged above, the 2023 Proxy contained materially false and misleading statements concerning the Company's related party dealings and its materially deficient internal controls.

122.    The 2023 Proxy was used to solicit shareholder votes in connection with the election of Defendants Liang, Tuan, and Liu to serve for another three-year term on the Company's Board to serve for another one-year term on the Company's Board.

123.    In addition, the 2023 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Liang and Weigand. While the shareholder vote was non-binding, the 2023 Proxy indicated that the Board "value[s] the opinions of our stockholders, and to the extent there is any significant vote against the named executive officer compensation as disclosed in this proxy statement, we expect to consider our stockholders' concerns and . . . evaluate whether any actions are appropriate to address those concerns."

124.    Describing the Company's "compensation guiding principles," the 2023 Proxy indicated that the compensation is performance-based:

Our executive compensation philosophy is to link a significant portion of NEO compensation to corporate performance using components such as performance-based restricted stock units ("PRSUs") and stock options and reduce our historical reliance on fixed compensation such as base salary, fixed bonuses and regularly refreshed stock grants with time-based vesting.

125.    The materially false and misleading statements contained in the 2023 Proxy regarding the Company's related party dealings and the weaknesses in the Company's internal controls therefore misleadingly induced shareholders to vote in favor of the election of Defendants Liang, Tuan, and Liu to serve for another three-year term on the Company's Board, and performance-based compensation to officers of SMCI, including Defendants Liang and Weigand, to which they were not entitled.

126.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duty

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

129.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

130.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of

prudent business judgment to protect and promote the Company's corporate interests.

131.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

132.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

134.   Plaintiff on behalf of SMCI has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

135.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SMCI.

137.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from SMCI that were tied to the performance or artificially inflated valuation of SMCI, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

138.    Plaintiff, as a shareholder and a representative of SMCI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

139.    Plaintiff on behalf of SMCI has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Abuse of Control

140.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.    The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

142.    As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

143.    Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Waste of Corporate Assets

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

146.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Actions.

147.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

148.    Plaintiff on behalf SMCI has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2024                Respectfully submitted,

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**

*/s/ Alex J. Tramontano*
ALEX J. TRAMONTANO

BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA 92101

- 43 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION OF LAWRENCE HOLLIN</u>

I, Lawrence Hollin, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9/10/2024 _____

Signed by:

*Lawrence Hollin*

940EF71032E3440...

_____
Lawrence Hollin